IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES DENT,                          )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )     Case No. 3:17 -CV-01356 -MAB
                                       )
JEFFREY M. DENNISON, ET AL.,           )
                                       )
            Defendants.                )

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Charles Dent, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges Eighth Amendment claims against Defendants, detailing that they knowingly housed him in unsanitary and unhealthy living conditions while he was incarcerated at Shawnee Correctional Center ("Shawnee") (Doc. 6). Now before the Court is Defendants Jeffrey M. Dennison, Brett Neighbors, and John Baldwin's motion and supporting memorandum for summary judgment (Docs. 87, 88). For the reasons set forth below, the Court grants Defendants' motion for summary judgment.

## PROCEDURAL BACKGROUND

Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. §1983 on December 15, 2017, alleging Eighth Amendment constitutional violations against officials at Shawnee (Doc. 1). Following a threshold review of the complaint pursuant to 28 USC § 1915A, Plaintiff was permitted to proceed on two Eighth Amendment Claims:

| Count 1 | Eighth Amendment deliberate indifference claim against Dennison and Baldwin for allowing Plaintiff to be housed in unsanitary and hazardous conditions at Shawnee since May 2016; |
|---|---|
| Count 2 | Eighth Amendment deliberate indifference claims against Dennison and Baldwin for depriving Plaintiff of regular access to meals, exercise, showers, chapel, and other out-of-cell activities since June 2017 because of a nonfunctional door access button, which prevents Plaintiff from exiting the cell when officers release the locks for the cellblock. |

(Doc. 6).

Plaintiff filed a motion for leave to file an amended complaint on January 8, 2018 (Doc. 11), which the Court granted in part and denied in part on January 22, 2018 (Doc. 18). The Court granted Plaintiff's request to add individual capacity claims against two Defendants: Jeffrey M. Dennison and John Baldwin. Additionally the Court allowed Plaintiff to add Defendant Brett Neighbors to his count 1 claim (Doc. 18, pp. 2-3).

In addition to his complaint, Plaintiff filed a motion for a temporary restraining order ("TRO") and preliminary injunction (Doc. 3). The motion for the TRO was denied as part of the threshold review (Doc. 6). The Court held a hearing on the motion for preliminary injunction on May 21, 2018 (Doc. 48).

On June 15, 2018, Magistrate Judge Williams issued a Report and Recommendation on Plaintiff's motion for preliminary injunction, finding that Plaintiff failed to meet his burden as Judge Williams found that "there is no evidence of unconstitutional conditions as it related to Plaintiff's current cell" nor was there evidence to suggest that the other conditions of his cells were sufficiently serious (Doc. 64, p. 15). The parties were permitted to file objections and responses to the Report and

Recommendation. Plaintiff filed his objection on July 2, 2018 (Doc. 67). These objections were considered by then Chief Judge Reagan and then overruled when the Court adopted the Report and Recommendations in its Order denying the motion for preliminary injunction, entered on September 10, 2018 (Doc. 70).

Defendants filed their motion for summary judgment on October 4, 2019 (Docs. 87, 88). Plaintiff filed his response on October 30, 2019 (Doc. 94).

## FACTUAL BACKGROUND

Plaintiff filed this lawsuit claiming that Defendants knowingly housed him in unsanitary and unhealthy living conditions, and also failed to mitigate those conditions (Doc. 6, p. 1).

At all relevant times to this litigation, Plaintiff was incarcerated in the Illinois Department of Corrections ("IDOC") (Doc. 88-1, p. 8). Plaintiff now resides at Graham Correctional Center ("Graham") (*Id.* at p. 60).

## I.     Parties

At the time of the alleged incidents, Plaintiff was housed at Shawnee (*Id.* at p. 9). Plaintiff never held a maintenance position (*Id.* at pp. 22-23). He does not have training in medical, engineering, carpentry, or plumbing (*Id.* at p. 7). Nor is Plaintiff an expert regarding mold (Doc. 88-4, pp. 23-24).

From 2016-2018, John Baldwin was the Director of IDOC. Defendant Baldwin details that he was not involved in the day-to-day decision-making regarding Shawnee, including what inmates were assigned to particular cells, the cell conditions, or when inmates spent time inside or outside their cells (Docs. 88-9; 90).

Defendant Jeffrey Dennison was, and still is, the warden of Shawnee during the relevant timeframe (Doc. 88, p. 2).

Defendant Brett Neighbors was the chief engineer at Shawnee during the relevant timeframe. His job is to correct mechanical problems at the prison as they arise (Doc. 88-4, pp. 41-47). Defendants contend that the multiple work orders show that Defendant Neighbors worked to abate any possible and known harms (Doc. 88-8, which shows Shawnee's maintenance logs).

## II.   Timeline of Events

On or around May 10, 2016, Plaintiff was emergency transferred from Big Muddy River Correctional Center ("Big Muddy") to Shawnee due to an external investigation against a correctional officer at Big Muddy (Docs. 6, p. 2; 30, p. 2). Plaintiff contends that while at Shawnee, he was held in approximately eight different cells and each cell had serious deficiencies that were not remedied by Defendants or other corrections officers, despite Plaintiff's requests, grievances, and letters (Doc. 6, pp. 2-3). Plaintiff describes experiencing unconstitutional conditions in his cell from when he was transferred to Shawnee on May 10, 2016 through May 27, 2018 (Docs. 21; 6, pp. 5-6; 88-1, p. 55; 88-2, p. 21).

In Plaintiff's first cell, which he called a "receiving cell," Plaintiff testified that the window had a broken knob, which meant that it was inoperable and could not be opened or closed (Doc. 88-1, p. 3). As a solution, Plaintiff reported that the screen in the window was cut so that prisoners could stick their hands through the screen to close the window, but he explained they had to be careful as the screens were sharp and could cut them

(*Id.*). In this receiving cell, about half of the floor tiles were loose and the floor would get covered in water when it rained because of the broken window and the difficulty that plaintiff had in closing it (*Id.*). Lastly, Plaintiff reports the vents were clogged with rust and dust (*Id.* at p. 4).

Plaintiff was then moved to his first cell, labeled 4D, 21. There were a number of issues with this cell, according to Plaintiff. While the cell had new windows, there were issues with the floor tiles where he could pick them up and move them around (*Id.*). In addition, there was low water pressure, no hot water, and the toilet did not work at all for a total of six days (*Id.*). During this time, Plaintiff and his cellmate were given a plastic bag to place over the toilet while it was inoperable and were sometimes let out of their cell, which they stayed in for approximately 21-24 hours per day, to use the toilet in the dayroom (*Id.*). When questioned as to whether Plaintiff alerted prison officials to these issues, he explained that there were several work orders submitted already so the officers were aware of the issues (*Id.* at pp. 4-5).

Plaintiff believes that the toilet needed a new valve, which prison officials fixed on or around day three of the toilet not working, but the toilet was only able to flush for approximately 1-2 hours before it broke again (*Id.* at p. 5). Plaintiff testified that fecal matter and urine built up over this time, so there were several days-worth of waste in the toilet before it was finally fixed on approximately day six of being broken (*Id.*). Plaintiff explained that he and his cellmate would put cardboard boxes over the plastic-covered toilet to keep the smell down (*Id.*).

Plaintiff testified that in this cell, there was no hot water and, in fact, there was no hot water in the showers either (*Id.* at pp. 5-6). In both his cell and the showers, no matter how long he let the water run, the water never turned warm or hot (*Id.*). In addition, the showers had peeling paint, mold, and covered vents. Plaintiff testified that Shawnee officials put metal plates over the vents instead of painting or fixing them (*Id.* at p. 6). Plaintiff testified that it is "common sense" to assume that officials placed these plates over the vents that had the most rust (*Id.* at p. 7). He believes the vents allowed hot steam or hot air to vent out, so with little to no ventilation, the showers built up more moisture, which in turn created more mold (*Id.* at p. 6). Plaintiff also testified that it was possible the vents brought in air as well, but since many of them were covered up with steel plates, they were not effective (*Id.*). The vents that were not covered up by metal plates were clogged with rust, built-up-over-time dust, and other particles due to old age (*Id.* at p. 7). Lastly, the shower drains were stopped up and water frequently collected in the showers and would not go down the drain (*Id.* at p. 6).   Plaintiff testified that he believed there was possible asbestos issues with the tiles since they were wet all the time (*Id.* at p. 7).

Around July 2016, Plaintiff was moved to his next cell, 4D, 77. Plaintiff testified that the same issues he experienced in his previous cell were also present in 4D, 77 except that the toilet worked in his new cell (*Id.*). The cell had new windows, but the vents were rusted over, there were loose tiles, peeled off paint, and low water pressure (*Id.*).

Around September 2016, Plaintiff was moved to another cell, 1D, 17 (*Id.* at p. 8). There were "floor tiles everywhere" in this cell (*Id.*). Additionally, the toilet had the opposite issue of his first cell in that it continually flushed (*Id.*). The vents were clogged

with rust and dust (*Id.*). The windows in this cell were broken as well. Plaintiff testified that the purpose of an operational window is to allow prisoners to control the temperature.

Portions of Shawnee have new windows and others have the original windows from 1984. The remaining new windows could not be installed in all of Shawnee due to lack of approval through capital funds at the Governor's office (Doc. 88-4, p. 44). The windows were requested by officials at Shawnee. The Housing Unit Four has new windows. The Housing Unit Three had new windows in three of the wings in 2016-2017 (*Id.*). Plaintiff was housed in both wings with and without new windows (Doc. 21). Plaintiff contends that Defendant Neighbors, as the Chief Engineer for over fifteen years, did not request new windows, even though he had the responsibility of "ensuring this practice [of using old windows] would stop" (Doc. 91, p. 5).

Plaintiff described that around October or November, Shawnee staff screwed the broken windows shut for the winter months. They also placed plastic bags over the windows and sealed them with duct tape (Doc. 88-1, p. 8). Plaintiff testified that because the windows were screwed shut and there was plastic over them, it blocked all of the air in the cell and, with the heat blasting, the cell was too hot (*Id.*).

Defendant Neighbors, through his position as chief engineer testified that he instructed personnel to screw shut the original windows in November and unscrew them in April in order to stop cold air infiltration in November and allow air flow in April (Doc. 88-4, pp. 45-48.). None of the original windows are able to be opened during

November to April (*Id.* at p. 45). In addition, plastic is duct taped to the windows and then removed when the windows are unscrewed in April (*Id.*).

Plaintiff testified that during winter, the showers in the dayroom had warm water, so he assumed the hot water gets turned on at Shawnee in the winter (Doc. 88-1, p. 9). These showers also had mold and vents that were rusted over (*Id.*).

In January 2017, Plaintiff was moved to cell 4A, 25 due to a flu outbreak that required inmates to be quarantined in different cells. He was in this cell for approximately one week (*Id.*). Plaintiff explained that this cell's lights did not work and the covers were broken on them (*Id.*). Plaintiff testified that the windows were new in this cell, but his mattress was the worst. Plaintiff explained that each time a prisoner moves cells, they have to leave the mattress in their cell and cannot take it with them (*Id.*). Every mattress he slept on at Shawnee was covered in stains from urine, fecal matter, and/or rust (*Id.*). Shawnee does not provide mattress covers to prisoners, but they do give them two sets of "old" sheets, which Plaintiff testified are usually ripped (*Id.*). Plaintiff also reported that the mattresses smell like urine and mildew, and appear to be wet at times (*Id.*). Plaintiff reports that he is not allergic to anything, but developed hives that lasted four to five days and that he "couldn't hardly breathe," prompting Shawnee officials to take him to the health care unit (*Id.*). Plaintiff was not sure if the mattresses caused these hives, but he believed it was possible; however, a physician never determined the source of the hives (*Id.* at pp. 9-10).

Soon after, Plaintiff was moved to a new cell, 4A, 53. The windows were new in this cell and they were not sealed, but the cell as a whole was dirtier than his last (*Id.* at

p. 11). This cell had similar issues to his previous cells—peeling paint, floor tiles that are easily moved, clogged vents that are rusted over, no air flow, and a dirty mattress (*Id.*). In addition, Plaintiff testified that House 4, where his cell (4A, 53) was located, had the worst showers at Shawnee, with rust, mold, low pressure in the showers themselves, and toilets that never worked (*Id.*). Plaintiff described that prisoners would use the toilets even though they rarely worked, so fecal matter and urine would build up and Shawnee staff did not put plastic bags over them to help tamp down the smell (*Id.*). Plaintiff testified the lights also did not work in this cell and while he was aware of the loose tiles and peeling paint, he was unsure as to whether the paint contained lead or the tiles exposed prisoners to asbestos (*Id.* at p. 12).

After cell 4A, 53, Plaintiff was moved to cell 3C, 53, which he described as the worst (*Id.*). Plaintiff was housed in this cell from approximately July 14, 2017 to January 8, 2018 (Doc. 94, p. 1). There were no new windows in this cell, but the bigger issue was that Plaintiff was unable to access the dayroom consistently because the access button for that cell, in particular, had not worked for years according to Plaintiff (Doc. 88-1, p. 12). The access button allows prisoners to be released from their cells. When Plaintiff's cell would not open, another prisoner would have to tell the officer to come open the cell with a key (*Id.*). Plaintiff testified that when he complained, the officer he spoke to told him the button could not be fixed, as it would cost too much money (*Id.*). Plaintiff testified that he missed "a lot of meals, chapel, dayroom because I couldn't get out all the time" (*Id.* at p. 13). Finally, because of the number of times he could not leave his cell, Plaintiff filed this lawsuit in November or December 2017 after filing "numerous grievances and

letters to the warden and the administrative review board trying to get out of that cell" (*Id.*).

Plaintiff testified that immediately after filing this lawsuit, he was moved to cell 2C, 53 (*Id.*). In this cell, the access button for his cell door worked, but Plaintiff testified that his cell had issues with the floor tiles, like in previous cells, and there was mold buildup in the showers. Additionally, the windows were all broken and while prison staff did seal these windows for the winter as previously described, Plaintiff testified that a screw "broke out" of the window, so it was wide open during December when "it was below zero, [Plaintiff] believe[s]" (*Id.* at p. 14). Plaintiff attempted to get moved because he described being freezing and unable to do anything, but he was not moved until the end of December (at the earliest) and was told that he either had to be in the freezing cell or go to segregation (*Id.*).

Plaintiff explained that after he filed his lawsuit, his conditions improved. He was then moved to 1D, 73, which was in a new wing that was cleaner than the other wings (*Id.*). The showers were better and while the window was broken in his cell, the weather was nice outside (*Id.*). The vents were also better, and Plaintiff had warm water (*Id.*).

Throughout his time at Shawnee, Plaintiff testified that he went to the healthcare unit and sought care for his mental health, seeing someone named Sherri Stone (*Id.* at p. 15). He attempted to get the mental health professionals to call maintenance to help with his conditions (*Id.* at p. 14). Additionally, he also sought medical care when he broke out in hives (*Id.* at pp. 14-15). Plaintiff described that the doctor was not at the prison, so they called him at home and he prescribed Benadryl and explained that if the hives did not

get better, Plaintiff should be taken to a hospital (Doc. 88-1, p. 15; 88-4). Plaintiff believes

he developed hives from the mattress, but testified that he did not know, for certain, what

caused the hives (Doc. 88-1, p. 40). He also thought they could have resulted from an

insect or other creature coming through his broken, open window and biting him;

however, no one ever found a bite mark (Doc. 88-4, pp. 5-7).

### III.   Grievances and Other Devices to Mitigate Conditions Issues

#### A. Work Orders

Mark Shumake is the assistant chief engineer at Shawnee. He explains in his

affidavit that a work order must be prepared in order to fix an issue or problem with a

cell, such as an inoperable access button (Doc. 88-9). If a prisoner has a problem or issue

with their cell, they may notify a correctional officer who will prepare a work order to

have this issue corrected. The prisoner may also write a grievance. The grievance will go

to the counselor who will then prepare a work order and the issue will be corrected (*Id.*).

No work orders were found for any issues concerning the access button to cell 3C:53 for

the timeframe during which Plaintiff occupied the cell, from July 2017 to January 2018

(*Id.*). Plaintiff contends that a work order is not possible for an inoperable access button,

as it is beyond the expertise of the maintenance department and their paygrade. In

addition, Plaintiff alleges that Mark Shumake executed a false declaration in this case

(Doc. 91, pp. 5-6).

#### B. Exterminator

An outside vendor came to Shawnee twice a month to exterminate vermin (Doc.

88-4, p. 46). Plaintiff contends that since the outside vendor only sprays the exterior of the

buildings and not the cellhouses or cells, it is ineffective (*Id.* at p. 48). Further, Plaintiff argues that Defendant Neighbors was aware of the pest infestation at Shawnee, but only allowed the contractor to spray around the buildings instead of inside the cellhouse (Docs. 88-1; 88-4, pp. 45-48).

### C.  Clogged Vents

Defendant Neighbors testified that the vents in the cells are for exhaust only. They do not blow any air into the cells (Doc. 88-4, p. 47). Plaintiff was able to clean the outside of the vents (*Id.* at p. 34). Plaintiff contends that while he was able to clean the outside of his cell vents, that is ineffective because he does not have a large blower, which the maintenance department has, to clean the ventilation vents every year (Doc. 91, p. 6).

### D.  Painting at Shawnee

Shawnee had a paint crew from 2015 through the present. Due to budget constraints, the facility was limited with the amount of paint that could be purchased during 2015-2017. The existing paint was used in the front areas and not necessarily in the cell houses. Painting does not kill mold and is done for aesthetic purposes. Defendant Neighbors testified that he does not know of any mold issues at Shawnee (Docs. 94, p. 2; Doc. 94-1; 94-2).

### E.  Plaintiff's Grievances

Plaintiff wrote two emergency grievances to Defendant Dennison concerning his cell conditions. Both were in October 2017 (Doc. 88-6). The grievances were deemed non-emergencies (Doc. 88-6, pp. 4, 6). Plaintiff contends that the grievances were deemed as non-emergencies without investigation (Doc. 91, p. 6).

Plaintiff then sent the denied emergency grievances directly to the Administrative Review Board ("ARB") (Docs. 88-5, 88-6). The ARB requested additional information from Plaintiff, including the counselor, grievance officer, and chief administrator's responses along with dates of the incidents (Doc. 88-6, pp. 1, 8). There is no evidence in the record that Plaintiff supplemented these grievances and sent the requested information to the ARB (Doc. 88, p. 5).

Additionally, there is no evidence that Plaintiff discussed the conditions or the emergency grievances with his counselor prior to filing the appeal with the ARB (Doc. 88-7). Plaintiff contends that he did not have to discuss any of this with his counselor prior to filing the appeal for his emergency grievance (Doc. 91, p. 7).

Plaintiff, on the other hand, argues that he wrote directly to Defendant Baldwin to make him personally aware of the inhumane conditions at Shawnee (*Id.*). Plaintiff argues that Defendant Baldwin was aware of the broken windows and the many inoperable access buttons for years (*Id.*, *citing to* Doc. 88-1). As support, Plaintiff points to a letter he wrote to Defendant Baldwin on October 30, 2017 (Doc. 91, pp. 7-8). Although this letter was specifically addressed to Defendant Baldwin, it was sent to and received by the ARB (*Id.*; Doc. 88-6, pp. 9-13). This letter was received by the ARB and returned to Plaintiff on or around November 8, 2017, instructing him to provide the dates of when incidents occurred in his grievance, as well as to provide his counselor's and CAO's responses (Doc. 88-6, p. 8).

**LEGAL STANDARD**

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

**DISCUSSION**

As indicated above, Plaintiff claims that the conditions of his confinement were unconstitutional for a totality of issues, including broken windows; loose floor tiles; a toilet that did not work for six days and when it was temporarily fixed, it stopped working the same day (Doc. 88-1, pp. 4-5); another toilet that continually flushed; peeling paint; mold in the showers; clogged shower drains; asbestos in the tiles; broken cell light covers; mattresses with stains that smelled; low water pressure and no hot water in his cell and showers (*Id.* at pp. 19-21, 28-29, 42-43); and vents covered and/or rusted (*Id.* at pp. 22, 28-29, 34, 42-43).

Additionally, Plaintiff describes that from approximately October or November until April, the broken cell windows were screwed shut with plastic sheeting placed over them to keep out the cold, which made the cells too hot, but then if the screws came out,

the cells become too cold (*Id.* at p. 14). Specifically, Plaintiff alleged that he suffered extreme cold with a broken window from December 13, 2017 to January 8, 2018, as well as vermin, bats, and other pests coming through the broken window (Doc. 91, p. 12). Finally, Plaintiff described being placed in a cell with a broken access button, which meant that he sometimes missed eating meals, going to chapel, and going to the yard. Plaintiff further claims that Defendants Dennison, Baldwin, and Neighbors were made aware of these intolerable conditions (through work orders and grievances), but did nothing to help.

"[R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society," and so, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (internal quotations omitted). Indeed, "the Constitution . . . does not mandate comfortable prisons." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). While "[i]nmates cannot expect the amenities, conveniences and services of a good hotel . . . the society they once abused is obliged to provide constitutionally adequate confinement." *Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir. 1988). Thus, prison officials violate the Eighth Amendment when "they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To succeed on a claim of deliberate indifference to a condition of confinement, a prisoner must show: (1) a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized

measure of life's necessities, and (2) prison officials were deliberately indifferent to this state of affairs. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quotation marks and citation omitted).

As to the first objective element, the Seventh Circuit has held that while a single broken window may not constitute a constitutional violation, claims centered on the "totality of conditions" or on violative customs or policies are sufficient for a plaintiff's claims to survive beyond summary judgment. *Hardy v. Illinois Dep't of Corr., Wexford Health Serv. Inc.*, No. 15-CV-0437-MJR, 2016 WL 7099964, at *8 (S.D. Ill. Dec. 6, 2016) (citing *Gray*, 826 F.3d 1000) (finding that the totality of conditions at Stateville, including pests, vermin, and birds, that may have exacerbated an inmate's asthma, were sufficient to proceed beyond summary judgment).

In *Gray*, the *pro se* plaintiff alleged that conditions at Stateville Correctional Center were so horrific that they rose to the level of a constitutional violation when viewed in the totality of those experiences. The plaintiff explained that birds flew into the prison and nested throughout, leaving droppings on the floors and walls, and prison officials rarely (approximately once every three months) attempt to remove the birds and nests *Id.* at 1004. Additionally, dander from vermin would build up over time, as the cell house was infested with mice, ants, spiders, flies, gnats, moths, and mosquitos, which the plaintiff argued was a result of the prison's failure to fix broken windows and other holes in the wall. The plaintiff suffered from asthma, and presented medical evidence that his asthma attacks increased during his time at Stateville. Additionally, he presented evidence that he developed skin rash (*Id.*).

As the Seventh Circuit highlighted, the *Gray* plaintiff had to do more than demonstrate a triable issue of fact with respect to the conditions he faced—he also had to show that he suffered some cognizable harm from the overall lack of a sanitary environment. *Id.* at 1006 (citing *Carey v. Piphus,* 435 U.S. 247 (1978)). That harm must be a physical injury "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id* at 1006, (citing *Hayes v. Snyder,* 546 F.3d 516, 523 (7th Cir. 2008)). The plaintiff in *Gray* relied on medical records to survive summary judgment, as those medical records showed an increase in treatment and severity of his condition. While the defendant contended that the plaintiff could not prove causation (between the conditions and the plaintiff's increase in asthma treatments), the Seventh Circuit held that his presentation of evidence of the infestations and evidence of his worsened health suggested a causal link sufficient to survive summary judgment. *Id.* at 1007-08.

Even when viewed independently, courts have found that many of the conditions Plaintiff alleged in his complaint can rise, depending on the duration and severity of the conditions, to the level of a constitutional violation. For example, even short-term issues with toilets can state a constitutionally viable claim. *See White v. Knight*, 710 F. App'x 260, 261–62 (7th Cir. 2018) (citing *Kirby v. Blackledge*, 530 F.2d 583 (4th Cir. 1976) (plaintiff who was held for three months in a cell with "no toilet facilities, save a hole in the floor" properly alleged a constitutional claim)). However, in determining when prison conditions pass beyond legitimate punishment and become cruel and unusual, the

"touchstone is the *effect upon* the imprisoned." *Rhodes v. Chapman,* 452 U.S. 337 (1981) (citation omitted); *Flakes v. Percy*, 511 F. Supp. 1325 (W.D. Wisc. April 10, 1981) (holding an Eighth Amendment violation for holding prisoners, due to mental illness, in a cell without water and a flushing toilet for any significant portion of time ); *Howard v. Wheaton*, 668 F. Supp. 1140 (N.D. Ill. 1987) (determining that 13 days without access to a flushing toilet, as well as no access to water in the cell, could be an Eighth Amendment violation and was sufficient to survive a motion to dismiss).

Similarly, courts have found extreme temperatures inside prisons can violate the Eighth Amendment. *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[I]t is well settled that exposing prisoners to extreme temperatures without adequate ventilation may violate the Eighth Amendment."); *White v. Monohan*, 326 F. App'x 385, 387 (7th Cir. 2009) (holding prisoner sufficiently stated conditions of confinement claim based on extreme cell temperatures over 100 degrees and the lack of ventilation); *Valigura v. Mendoza*, 265 F. App'x 232, 235 (5th Cir. 2008) ("We have held that temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment." (citing *Gates v. Cook,* 376 F.3d 323, 339–40 (5th Cir. 2004)). In determining whether the heat is unconstitutionally excessive, the Court must look at both the severity of the heat and its duration. *Chandler*, 379 F.3d at 1295; *Cf. Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) ("[I]t is not just the severity of the cold, but the duration of the condition, which determines whether the conditions of confinement are unconstitutional."). The lack of heat, in and of itself, can violate the Eighth Amendment,

particularly when the inmate is not given alternative means to combat the cold that are inadequate and the cold persists for *months*. *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997).

Likewise, accessing time outside of a cell can rise to a constitutional violation; however, the plaintiff must present evidence of the duration and impact of that time confined to his cell. For example, denials of exercise and yard time may be inevitable in the prison context, but are not so detrimental as to constitute a constitutional deprivation. *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001) (citing *Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir.1997)) (70–day denial permissible); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir.1988) (28 day denial not deprivation). Twenty-eight days without access to the outdoor yard is not ideal, but it is not a constitutional deprivation. *E.g.*, *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001) ("We think it a reasonable rule that a denial of yard privileges for no more than 90 days at a stretch is not cruel and unusual punishment.").

In the present matter, the Court must assess whether a reasonable juror could find that the conditions Plaintiff described were serious enough to deny the "minimal civilized measure of life's necessities" based on the precedent outlined above, which emphasizes that prisoners must provide descriptions of *how* the conditions impacted them, as well as provide descriptions of the duration and severity of the alleged issues. Plaintiff in the present matter has not met this burden.

For example, for Plaintiff's claims related to loose floor tiles, wet floors, clogged vents, low water pressure, no hot water, peeling paint, mold in showers, toilets not

flushing, and the asbestos in the floor tiles, Plaintiff indicated that these issues did not affect him beyond a temporary inconvenience or bad smell (Doc. 88-1, pp. 19, 21, 28-29). Put simply, he does not include details of how he was harmed by these conditions. Additionally, Plaintiff does not have any evidence that the floor tiles actually had asbestos in them or that the paint had lead in it (*Id.* at p. 27, 46). While Plaintiff claimed that the vents were clogged, which did not allow for clean air to circulate throughout the prison and contributed to mold build up in the showers, he then admits that he does not know how the vents work at Shawnee (*Id.* at pp. 22-23).

Rule 56 does not require Defendants to provide any evidence to negate Plaintiff's claim. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citation omitted). Defendants can instead discharge their burden under Rule 56 by pointing out that there is an absence of evidence to support Plaintiff's claim, which is what Defendants have done here. *Id.* But even so, Defendants have also provided the Court with additional evidence to further negate that Plaintiff was subjected to unconstitutional conditions and, in fact, that Shawnee officials took affirmative steps to mitigate the issues described by Plaintiff.

Plaintiff complained of a vermin infestation, but provided few details beyond stating that there were "vermin, bats, knats[sic], and other pests" that came through open windows (Doc. 91, p. 12). Plaintiff believed that the exterminator should come into the building to spray and that would resolve the issue; however, he did not present any other evidence as to the extent, severity, or length of the alleged infestation.

Defendants, on the other hand, provided details about the exterminator—they hire an outside vendor who comes to the facility twice a month (Docs. 88-4, p. 46; 88-8, p. 50-74, which includes exterminator status reports). In fact, the exterminator reported on multiple occasions that he treated for pests like cockroaches and mice and did not witness any pest activity (Doc. 88-8, p. 50, dated 8/2/16, "no pest activity noticed" referring to cockroaches; p. 54, dated 1/17/17, "no pest activity noticed" referring to mice). Defendants also provided evidence that the vents in his cell, which Plaintiff complained of being dirty and inoperable, are used for exhaust only and do not bring in clean air (Doc. 88-4, p. 47). Plaintiff attempted to argue that he developed hives either from a dirty mattress or from being bitten by an animal that came through his broken window, citing to *Gray v. Hardy;* however, unlike in *Gray¸* Plaintiff testified that a doctor did *not* determine the source of the hives (Docs. 88-1, pp. 9-10; 91, p. 12). Additionally, no one, including Plaintiff, found a bite mark (*Id.*).

Similarly, Plaintiff's complaints of being too hot and too cold, based on whether the windows were sealed or broken (and open) during the winter months are simply just complaints. Plaintiff does not explain anything beyond discomfort—he does not include information about how hot his cell got or whether he requested a fan, for example, and was denied access to it, which could mitigate the heat. Plaintiff then complains that when a screw came loose from his window in December, his cell became too cold, but again, he does not include information about alternative means to combat the cold that would make his conditions constitutionally inadequate. Even when viewing this minimal evidence in the light most favorable to Plaintiff, he endured a cold cell for about a month,

which in and of itself does not rise to the level of a constitutional violation. *Dixon*, 114 F. 3d at 643. In fact, Plaintiff did not allege he suffered at all from these cold temperatures; rather, he just stated that it was extremely cold (Doc. 91, pp. 12, "Plaintiff suffered excessive cold with a broken window;" p. 13, "Plaintiff suffered…severe cold."). *See also Cf. Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (holding that inmate failed to show that "he suffered from anything more than the usual discomforts of winter" when he stated that as a result of cold temperatures in his cell "he suffered from hurt ears and numb hands, felt frostbite, and caught colds"). Put simply, Plaintiff's assertions are not supported by data or evidence.

Finally, Plaintiff complained of the access button not working in one of his cells, which meant that he missed out-of-cell activities, including going to chapel, meals, recreation time, and showers, for example. Plaintiff states he was in this cell from July 14, 2017 through January 8, 2018 (approximately one month after this lawsuit was filed) (Doc. 91, p. 12). But still, the evidence in support of Plaintiff's claim is sparse.

In support of his argument, Plaintiff submitted three affidavits from fellow prisoners, who stated that they helped Plaintiff "on a daily basis get out of his cell" (*Id.* at p. 74). Additionally, they stated that sometimes the guards would open his cell and sometimes they would wait thirty minutes to one hour to open it. *Id.* This delay would cause Plaintiff to sometimes miss meals and yard time (*Id.* at p. 76). Additionally, these prisoners witnessed Plaintiff ask for the door to be fixed or for work orders to be put in, which they describe the guards ignoring (*Id.* at p. 74).

But still, there is not enough evidence to detail Plaintiff's constitutional deprivations from a reduction of out-of-cell time. One of the prisoner affidavits states that another prisoner helped Plaintiff out of his cell daily, which could suggest that while bothersome, Plaintiff was not denied a significant amount of time out of his cell (Doc. 91, p. 74). Additionally, the record indicates that in order to fix an access button, Plaintiff could have sent in a work order and there are no work orders in the record (Doc. 88-9). Plaintiff was also instructed, through his grievances on this issue (which were submitted as emergency grievances directly to the ARB), to first go through his counselor to get this access button fixed, as his counselor was the appropriate person to contact for this issue. There is nothing in the record to indicate that Plaintiff followed up with his counselor (Docs. 88-6, p. 8; 88-7).

It appears the only part of the record that gives the Court a bit more detail here is in the form of medical notes, a few of which were submitted by Plaintiff in his response to the motion for summary judgment. In one medical note, dated November 13, 2017, Plaintiff's clinician indicates that his cell access button is not working and the officers are not unlocking his door. Additionally, the windows are screwed shut, which means his cell is hot and this is "distressing him" (Doc. 91, p. 79). Plaintiff communicated that he is fearful of fire (*Id.*).

About a month later, on December 14, 2017, Plaintiff was seen again by his clinician, where he detailed that he is "miserable," because the screws have fallen out of the window and it is now too cold in his cell (*Id.* at p. 82). Plaintiff's clinician stated that

he should put in work orders for the window and cell access button, and Plaintiff responded that he had already done that (*Id.*).

While the conditions described appear to be unpleasant at times, no reasonable juror could find that these conditions rise to the level of a constitutional violation. The Eighth Amendment is implicated only when a prisoner is forced to endure deprivations of the minimal civilized measure of life's necessities. *Hudson v. McMillian,* 503 U.S. 1, 8–9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Reed v. McBride,* 178 F.3d 849, 852 (7th Cir.1999). *Williams v. Berge*, 102 F. App'x 506, 507 (7th Cir. 2004). Here, there is simply not enough evidence for Plaintiff to show that he was deprived of "the minimal civilized measures of life's necessities." *Id. See also Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." (internal citations omitted)); *Payne v. Pauley,* 337 F.3d 767, 772–73 (7th Cir. 2003) ("[T]he Federal Rules of Civil Procedure require the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.' Conclusory allegations, unsupported by specific facts, will not suffice." (quoting FED. R. CIV. P. 56(e))).

Because Plaintiff cannot satisfy the objective component of his conditions of confinement claim, the Court need not consider the subjective component of whether Defendants were deliberately indifferent. Defendants are entitled to summary judgment, which also eliminates the need to address the issue of qualified immunity.

## CONCLUSION

For the above stated reasons, Defendant's motion for summary judgment (Doc. 88) is **GRANTED** and this action is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: March 25, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**